## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MANIILAQ ASSOCIATION,** | |
| **Plaintiff,** | |
| v. | Civil Action No. 15-152 (JDB) |
| **SYLVIA M. BURWELL, in her official capacity as Secretary, U.S. Department of Health & Human Services, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

For more than twenty years, the Secretary of Health and Human Services has allocated $30,921 a year in federal funds toward renting health clinic space in the Native American village of Kivalina, Alaska. Maniilaq Association, a regional health corporation that now owns and operates the clinic in Kivalina, believes that amount is insufficient to assure adequate healthcare in that community. In an attempt to remedy the Kivalina clinic's chronic underfunding, Maniilaq submitted a lease proposal based on section 105(l) of the Indian Self-Determination and Education Assistance Act. That section, Maniilaq argues, requires the Secretary to rent its Kivalina clinic space and pay it compensation, based on the clinic's operating costs, of $249,842 a year. But the Secretary declined Maniilaq's proposal, arguing that it must pay Maniilaq no more than the $30,921 it has provided previously. Maniilaq sued, and cross-motions for summary judgment are now pending before the Court.[1] The Court will grant summary judgment for Maniilaq, and direct

---

[1] See Pl.'s Mot. for & Mem. in Supp. of Summ. J. [ECF No. 10] (Pl.'s Mem.); Gov't's Cross-Mot. for & Mem. in Supp. of Summ. J. & Opp'n [ECF No. 15] (Gov't's Mem.).

the parties to enter into discussions regarding Maniilaq's Kivalina lease proposal consistent with this opinion.

## BACKGROUND

Under Title V of the Indian Self-Determination and Education Assistance Act (the Act), qualifying tribes or inter-tribal consortia may enter self-governance compacts to administer health services ordinarily provided by the Department of Health and Human Services (the Secretary). In 1994, the Alaska Native Tribal Health Consortium and the Secretary entered the Alaska Tribal Health Compact (the Compact). See Ex. A to Pl.'s Mem. [ECF No. 10-2] (Compact). Maniilaq Association, a non-profit association that provides health care services to twelve member tribes, is one co-signer of the Compact. Each compacting tribe or inter-tribal consortium must also enter into a written funding agreement with the Secretary. See 25 U.S.C. § 458aaa-4(a); see also 25 U.S.C. § 458aaa(b) (definition of Indian tribe). These funding agreements should identify the programs to be administered by the tribe, see id. § 458aaa-4(d)(1), and "authorize the Indian tribe to plan, conduct, consolidate, administer, and receive full tribal share funding" for the included programs, see id. § 458aaa-4(b)(1).

The statute dictates the minimum amount of tribal funding. "The Secretary shall provide funds under a funding agreement . . . in an amount equal to the amount that the Indian tribe would have been entitled to receive under self-determination contracts under [Title I of the Act]." Id. § 458aaa-7(c); see also Compact Art. II, § 3 ("Subject only to the appropriation of funds by the Congress of the United States and in accordance with [25 U.S.C. § 458aaa-7], the Secretary shall provide the total amounts specified in the Funding Agreements."). Title I, in turn, requires the Secretary to provide "not . . . less than" the amount that she "would have otherwise provided for the operation of the programs" administered by the tribal organization; contract support costs; and,

2

in the first year of a contract, start-up costs. [2] Id. § 450j-1(a) (often referred to as section 106(a) of the Act). "At the option of an Indian tribe, a funding agreement may provide for a stable base budget specifying the recurring funds (including, for purposes of this provision, funds available under [section 106(a)]" to be transferred to the compacting tribal organization. Id. § 458aaa-4(g).

In fiscal year 2011, for example, Maniilaq Association received approximately $41.5 million under its funding agreement with the Secretary. See Ex. B to Pl.'s Mem. [ECF No. 10-3] (Funding Agreement) at 11–12. That amount was the sum of several component parts: recurring base funding, see id. at 11, 13–14; non-recurring funding, distributed from available funds at the beginning of each fiscal year, see id. at 11 & n.2; and tribal shares of available IHS headquarters and Alaska-area office funds, allocated among the Alaska tribes using methodologies "adopted in a caucus open to all Alaska Tribes and tribal organizations," see id. at 11–12 & nn.3–4. Under the Compact, Maniilaq reserves the right to "reallocate or redirect" its funds among compacted programs "in any manner . . . which [it] deems to be in the best interest" of its communities. Compact, Art. III, § 5. The Community Health Aide (CHAP) and Village Built Clinic (VBC) programs are the compacted programs relevant to this case.

The CHAP funds the training of health aides and practitioners who provide acute, chronic, and preventative health care in remote village locations. The VBC program was created to lease clinic space for use by the CHAP practitioners, and has its origins in congressional appropriations bills that appropriated earmarked funds for that purpose. But Congress has not earmarked funds for VBC leases since 1989, so in the decades since, the Secretary has allocated lease funding out of its Hospitals and Clinics Budget Line Item. See Pl.'s Mem. at 7–8. Most frequently, the Secretary leases clinic space owned by the villages themselves, see Ex. K to Pl.'s Mem. [ECF No.

---

[2] Neither contract support costs nor start-up costs are at issue in this case.

10-12] at 1, and calculates the applicable lease amount pursuant to a 1991 circular, see Ex. J to Pl.'s Mem. [ECF No. 10-11] at 1. The circular's formula makes the lease amount a function of a number of factors, including village population, clinic patient encounters, the price of fuel, the size of the clinic, and the available budget. See id. at 3–4. The Secretary considers the resulting leases to be "full service," meaning they are intended to compensate the lessor for "rental of the space, utilities, and all maintenance and operational costs associated with the clinic." Id. at 4. But because the lease amount is not based explicitly on the fair market value of the clinic or on the real costs associated with running it, the lease amount often proves inadequate. According to a 2007 report by the Alaska Native Health Board, "lease funding [then] cover[ed] only approximately 55% of the current operating costs." Ex. K to Pl.'s Mem., Executive Summary. That funding shortfall is the impetus behind this case.

Since 1996, Maniilaq has compacted to administer the VBC program—in other words, to secure clinic space in its constituent villages for the CHAP practitioners. Rather than lease the clinic space directly, Maniilaq obtained it through a buyback-withhold agreement with the Secretary, who leased clinic space on Maniilaq's behalf, then withheld the lease amount from the funding that Maniilaq received under the Compact. See Ex. B to Pl.'s Mem. at App. E, ¶ 2.2.2. In February 2012, Maniilaq sought to change this arrangement. By that time, it owned clinic space in all but one of its constituent villages. And as a result, it had assumed the burden of the VBC leases' "chronic underfunding," covering clinic costs by diverting funds from other programs when necessary.

Maniilaq proposed a two-step remedy in a memorandum to the Secretary. See Ex. C to Pl.'s Mem. [ECF No. 10-4]. First, it would retrocede to the Secretary administration of the VBC program, essentially making the Secretary responsible for procuring the clinic space in its villages.

See 25 U.S.C. § 458aaa-5(f) (governing retrocession).  Next, it would lease its clinic spaces to the Secretary, through leases negotiated under section 105(l) of the Act.  See 25 U.S.C. § 450j(l); see also 25 C.F.R. §§ 900.69–900.74 (implementing regulations).   Section 105(l) requires the Secretary to enter into leases for tribally owned facilities used for the administration of services under the Act, upon the tribal owner's request.  See 25 U.S.C. § 450j(l); see also Compact Art. II, § 8(d) ("Upon the request of a Co-Signer, the Secretary shall enter into a lease with the Co-Signer in accordance with section 105(l) of the [Act], as amended.").  But more importantly, under Maniilaq's reading of the statute and its implementing regulations, the amount of compensation paid under those leases must be based on the reasonable expenses incurred through the operation of the clinics.  See Ex. C to Pl.'s Mem. at 1–2.  Putting the two steps together, then, Maniilaq proposed exchanging the inadequate lease funding based on the Secretary's formula for much higher lease compensation based on its real costs.

When the Secretary refused to accept the full retrocession of the VBC program, Maniilaq limited its retrocession offer to its clinic in Ambler, Alaska, which it had acquired in 2003.  In the year before Maniilaq's Ambler proposal, the Secretary had provided about $30,000 for the operation of the Ambler clinic.  Based on "documentation of costs incurred and projected," however, Maniilaq proposed a lease amount of approximately $170,000 a year.  Ex. E to Pl.'s Mem. [ECF No. 10-6] at 4.  The Secretary declined Maniilaq's final offer, see Ex. F to Pl.'s Mem. [ECF No. 10-7]—but not within the 45-day window prescribed by the statute, see 25 U.S.C. § 458aaa-6(b).  In the resulting lawsuit, Judge Hogan of this court concluded that a section 105(l) lease could be incorporated into a self-governance funding agreement, and held that the Ambler lease proposal had been added to Maniilaq's agreement as a matter of law.  See Maniilaq Ass'n v. Burwell, 72 F. Supp. 3d 227, 235–40 (D.D.C. 2014).  But the court did not have occasion to address

Maniilaq's argument that section 105(l) entitles it to fully funded leases for each of its clinics. <u>See</u> <u>id.</u> at 231 n.4.

Maniilaq now seeks to establish that principle through this litigation about its Kivalina clinic. Beginning in October 1994, the Secretary leased a 927 square-foot clinic from the Kivalina City Council. <u>See</u> Ex. H to Pl.'s Mem. [ECF No. 10-9] (Kivalina Declination) at 40, 10. After Maniilaq began administering the VBC program in 1996, the lease amount—$30,921.01 a year— was withheld annually from its funding pursuant to the buyback-withhold agreement. But by January 2012 Maniilaq had secured a new, 1,240 square-foot clinic in Kivalina, and so it instructed the Secretary to cancel its lease with the Kivalina City Council. <u>See id.</u> at 12, 18. Per its request, Maniilaq began receiving the $30,921 associated with the Kivalina clinic annually through its funding agreement. <u>See id.</u>

After the decision in <u>Maniilaq Association</u>, Maniilaq proposed retroceding the Kivalina VBC program and entering a section 105(l) lease for its new Kivalina clinic. Based on section 105(l)'s implementing regulations, and on its "actual expenditures" over the prior year, Maniilaq proposed that its new Kivalina clinic lease should be in the amount of $249,842 per year.[3] <u>See id.</u> at 34–36. This time, the Secretary declined Maniilaq's final offer within the requisite time frame, on the grounds that "the amount of funds proposed in the final offer exceeds the applicable funding level to which the Tribe is entitled under [the Act]." <u>Id.</u> at 2 (citing the statutory declination ground at 25 U.S.C. § 458aaa-6(c)(1)(A)(i)). By the Secretary's reasoning, Maniilaq was entitled only to the amount that she would pay if leasing Kivalina clinic space herself. And, "as demonstrated by the amount [she] <u>did pay</u> for Kivalina before the retrocession," that amount was $30,921. <u>Id.</u> at 2

---

[3] Maniilaq hoped its new section 105(l) lease would take effect on February 1, 2015, and run through September 30, 2015. For this first eight-month lease period, Maniilaq requested a prorated share of $249,842, the total annual amount. <u>See</u> Kivalina Declination at 35–36. It further proposed that the lease would be renewable in one-year terms at the option of either party. <u>See id.</u> at 37–38.

(emphasis added). "[S]o long as [the Secretary] has provided Maniilaq what [she] otherwise would have provided for the [Kivalina lease]," neither Section 105(l) nor its implementing regulations required her to provide additional funding. See id. at 6–7. Thus, in the Secretary's view, Maniilaq could receive its funding through a separately negotiated lease or through its funding agreement, but it was not entitled to more than $30,921 a year for the Kivalina clinic. See id. at 4–5.

Maniilaq sued, asking this Court to: (1) declare that compensation for section 105(l) leases is "mandatory" and must be funded in an amount "distinct from . . . the amount the [Secretary] would have otherwise provided for [the Kivalina VBC program]," (2) reverse the Secretary's declination and compel her to incorporate Maniilaq's proposed lease into its funding agreement, and (3) order the Secretary to pay Maniilaq $249,842 in lease compensation. See Compl. [ECF No. 1] ¶ 64. After a February 19, 2016, motions hearing, the parties' cross-motions for summary judgment are pending before the Court.

## LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). When ruling on a motion for summary judgment, the court must draw all justifiable inferences in the non-moving party's favor and accept the non-moving party's evidence as true. Anderson, 477 U.S. at 255. Here, under the Act, in any appeal of a declination, "the Secretary shall have the burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the offer." 25 U.S.C. § 458aaa-6(d). The Secretary does not dispute that the Court's review is de novo. See Gov't's Mem. at 17; see also Pyramid Lake Paiute Tribe v. Burwell, 70 F. Supp. 3d 534, 541–42 (D.D.C. 2014).

7

Statutes passed for the benefit of Indian tribes, moreover, "are to be construed liberally in favor of the Indians with ambiguous provisions interpreted to their benefit." <u>Chickasaw Nation v. United States</u>, 534 U.S. 84, 93–94 (2001) (internal quotation marks omitted).   This canon of interpretation has been incorporated into the various sources of law governing this case. Title V of the Act requires that "[e]ach provision of this part and each provision of a compact or funding agreement shall be liberally construed for the benefit of the Indian tribe participating in self-governance and any ambiguity shall be resolved in favor of the Indian tribe." 25 U.S.C. § 458aaa-11(f); <u>see also</u> 25 C.F.R. § 900.3(a)(5).   Similarly, the "Secretary's commitment to Indian self-determination requires that the[] regulations [also] be liberally construed for the benefit of Indian tribes and tribal organizations," with any ambiguities "construed in favor of the Indian tribe or tribal organization so as to facilitate and enable the transfer" of federal programs and activities.[4] 25 C.F.R. § 900.3(b)(11).   But this canon of interpretation "does not permit [courts to rely] on ambiguities that do not exist."   <u>South Carolina v. Catawba Indian Tribe, Inc.</u>, 476 U.S. 498, 506 (1986).  Application of the canon "need not be conclusive" on the issues before the Court, and the canon's force may be overcome by "other circumstances evidencing congressional intent." <u>Chickasaw Nation</u>, 534 U.S. at 94 (internal quotation marks omitted).

---

[4] In an ordinary case, an agency's interpretation of its own regulations may be entitled to deference. <u>See</u> <u>Auer v. Robbins</u>, 519 U.S. 452, 462 (1997).  The Secretary has not sought such deference here. <u>See</u> Gov't's Mem at 17.  But even if she had, it is not clear that deference to her interpretation would be appropriate.  In this circuit, courts "typically do not apply full <u>Chevron</u> deference to an agency interpretation of an ambiguous statutory provision involving Indian affairs." <u>California Valley Miwok Tribe v. United States</u>, 515 F.3d 1262, 1266 n.7 (D.C. Cir. 2008). Instead, "the canon of construction in favor of Indian tribes can trump the deference to agencies' interpretations courts ordinarily give under <u>Chevron</u> and its progeny." <u>Maniilaq Ass'n</u>, 72 F. Supp. 3d at 232.

There is good reason to believe that the canon trumps <u>Auer</u> deference as well. <u>See</u> <u>Cobell v. Norton</u>, 240 F.3d 1081, 1103 (D.C. Cir. 2001) ("'Whenever doubt or ambiguity exists in federal statutes or regulations, such doubt is resolved in favor of the tribes.'" (emphasis added and brackets omitted) (quoting <u>Jicarilla Apache Tribe v. Supron Energy Corp.</u>, 728 F.2d 1555, 1563 (10th Cir. 1984) (Seymour, J., concurring in part and dissenting in part)); <u>see also</u> <u>Navajo Health Found.—Sage Mem'l Hosp., Inc. v. Burwell</u>, 100 F. Supp. 3d 1122, 1175–76 (D.N.M. 2015) (holding that the Secretary is not entitled to deference when construing the Act's implementing regulations).  Indeed, such deference may be doubly precluded here, because the Secretary has vowed to construe the regulations liberally for Maniilaq's benefit. <u>See</u> 25 C.F.R. § 900.3(b)(11).

## DISCUSSION

### I.   Final Offer and Declination Procedures

To assess the legality of the Secretary's declination, one must start with Maniilaq's proposal. Maniilaq properly submitted its Kivalina lease proposal through the Act's final offer procedures, see Maniilaq Ass'n, 72 F. Supp. 3d at 237–39, which are available to a tribal organization "[i]n the event the Secretary and a participating Indian tribe are unable to agree . . . on the terms of a compact or funding agreement," 25 U.S.C. § 458aaa-6(b).  Upon receiving a final offer, the Secretary has 45 days to make a decision.  Id.  If she decides to reject the offer, she must provide "a timely written notification to the Indian tribe that contains a specific finding that clearly demonstrates, or is supported by a controlling legal authority," that one of the four statutory declination grounds applies.  Id. § 458aaa-6(c)(1)(A).  The ground that the Secretary invokes here is that "the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under this part."  Id. § 458aaa-6(c)(1)(A)(i).  At the motions hearing, Maniilaq acknowledged that the Secretary's declination was procedurally proper.  The dispute in this case, then, is about the "applicable funding level to which [Maniilaq] is entitled."

For self-governance compactors like Maniilaq, that inquiry must begin with the "[a]mount of funding" provision in Title V of the Act.  That section requires that:

> The Secretary shall provide funds under a funding agreement under this part in an amount equal to the amount that the Indian tribe would have been entitled to receive under self-determination contracts under this [Act] . . . .

25 U.S.C. § 458aaa-7(c).  "[S]elf-determination contracts," in turn, are governed by Title I of the Act, which places a floor under the "[a]mount of funds provided."  See id. § 450j-1(a).  Under section 106(a), the

> amount of funds provided . . . shall not be less than the appropriate Secretary would have otherwise provided for the operation of the

> programs or portions thereof for the period covered by the contract, without regard to any organizational level . . . at which the program, function, service, or activity . . . is operated.

Id. § 450j-1(a)(1).  Stringing these various provisions together, Maniilaq is "entitled" to "not . . . less than" the amount of funds the Secretary "would have otherwise provided for the operation" of the program or activity at issue.  This so-called "Secretarial amount" has been defined by the D.C. Circuit as "the amount of funding that would have been appropriated for the federal government to operate the program[] if [it] had not been turned over to the Tribe."  Ramah Navajo Sch. Bd., Inc. v. Babbitt, 87 F.3d 1338, 1341 (D.C. Cir. 1996).  Thus, when a tribal organization assumes control over a program or activity, section 106(a)(1) entitles the organization to an amount of funding that would place it "in the same position as those government agencies that would otherwise be carrying out the activities."  S. Rep. 103-374, at 12 (1994) (describing this parity as the "original intent of the Act").

But absent some separate statutory entitlement to funding, section 106(a)'s funding floor can double as a funding ceiling.  If section 106(a) defines in full the "applicable funding level to which the Indian tribe is entitled," the Secretary may permissibly decline any proposal seeking funds in excess of that amount.  See, e.g., Los Coyotes Band of Cahuilla & Cupeño Indians v. Jewell, 729 F.3d 1025, 1033 (9th Cir. 2013) ("[The Act] limits the amount of money that a tribe may obtain under a [self-determination] contract to the amount that the [Secretary] is currently spending on the program in existence for which the tribe seeks to obtain a contract to operate." (emphasis added)).  That is the legal theory underlying the Secretary's declination here.  Between 1994 and 2012, the Secretary paid $30,921 per year to administer the relevant "program, function, service, or activity"—securing clinic space in Kivalina.  That amount, she argues, is what she would continue to pay if she were still procuring the clinic space herself.  And because no other

statutory provisions entitle Maniilaq to additional funding, $30,921 is all that Maniilaq is entitled to under the Act for the Kivalina clinic.

## II.   Does Section 105(l) Entitle Maniilaq to a Specific Level of Funding for the Kivalina Lease?

Maniilaq, of course, disagrees. In its view, section 105(l) and the implementing regulations create a "specific funding scheme" that entitles it to a "fully compensated" lease for its Kivalina clinic. Pl.'s Mem. at 2. The Court is not as sure. But Maniilaq offers a reasonable interpretation of an ambiguous statute and its ambiguous regulations. Because the Secretary has not shown that her alternative reading is compelled by those sources, the Court will—as it must—construe the ambiguity in Maniilaq's favor.

### A.   Section 105(l) and its Regulations are Ambiguous Regarding the Necessary Amount of Lease Compensation

As section 105(l) is central to this dispute, it is worth quoting in its entirety:

### Lease of facility used for administration and delivery of services

(1)   Upon the request of an Indian tribe or tribal organization, the Secretary shall enter into a lease with the Indian tribe or tribal organization that holds title to, a leasehold interest in, or a trust interest in, a facility used by the Indian tribe or tribal organization for the administration and delivery of services under this subchapter.

(2)   The Secretary shall compensate each Indian tribe or tribal organization that enters into a lease under paragraph (1) for the use of the facility leased for the purposes specified in such paragraph. Such compensation may include rent, depreciation based on the useful life of the facility, principal and interest paid or accrued, operation and maintenance expenses, and such other reasonable expenses that the Secretary determines, by regulation, to be allowable.

25 U.S.C. § 450j(l); see also 25 U.S.C. § 458aaa-15(a) (applying section 105(l), which is codified in Title I of the Act, to Title V compactors like Maniilaq). Section 105(l) thus entitles Maniilaq to "compensation." Although the statute does not expressly say how much, it does tether the concept

of compensation to those "reasonable expenses"—listing several—included in the lease. Section 105(l) leaves it to the Secretary to determine, by regulation, which "reasonable expenses" are "allowable." In the implementing regulations, the Secretary took this delegation and ran—in every which direction.

In purporting to set the "requirements" for section 105(l) leases, the regulations quickly jettison the more permissive "may" contained in the statute. <u>See</u> 25 US.C. § 450j(l)(2) ("Such compensation <u>may</u> include . . . ." (emphasis added)). A lease "<u>is to include</u> compensation as provided in the statute <u>as well as</u> 'such other reasonable expenses that the Secretary determines, by regulation, to be allowable.'" 25 C.F.R. § 900.69 (emphasis added). The title to the next section of the regulations also speaks in mandatory terms, addressing those elements that "<u>are included</u> in the compensation for a lease" between the Secretary and a tribal organization. <u>Id.</u> § 900.70 (emphasis added). But then that mandatory language drops away: "To the extent that no element is duplicative," any of the elements listed in the regulations "<u>may be included</u> in the lease compensation." <u>Id.</u> (emphasis added). As far as the Court can tell, there is no obvious way to reconcile this vacillation between permissive and mandatory language.

The apparent textual contradictions do not end there. The title to section 900.74 asks: "How may an Indian tribe or tribal organization propose a lease to be compensated for the use of facilities?" Yet the body of the regulation appears to answer a different question. Rather than addressing the tribe's "propos[al]," the regulations address the contents of the resulting "lease." This quick—and again unexplained—transition from proposal to lease is symptomatic of the drafting imprecisions that pervade the regulations. What section 105(l) refers to as "expenses," the regulations variously refer to as "elements," <u>id.</u> § 900.70, or "costs," <u>id.</u> § 900.73. And it is not clear where these "elements" or "costs" may (or must) be accounted for. Sometimes, they are

included in "[t]he lease." Id. § 900.69.  At other times, they are included in "the compensation for a lease."  Id. § 900.70.  Even the purpose behind the lease requirement is somewhat obscure.  Are section 105(l) leases available so that tribal compactors can "recover the types of cost described" in the regulations?  Id. § 900.73 (title).  Or so compactors can "be compensated for the use of facilities"?  Id. § 900.74 (title).  Is there a meaningful difference between the two?  When taken together, these imprecisions frustrate the Court's search for a steady place to get its footing. Section 105(l) itself does not make clear how much compensation must be paid under a lease. And, to put it mildly, the regulations do not help dispel that ambiguity.

### B. Maniilaq's Interpretation is Reasonable

Maniilaq has marked one path across this ever-shifting linguistic ground.  Under section 105(l), Maniilaq argues, it is entitled to a lease for its Kivalina clinic and payment of "compensation."  The amount of that compensation is based upon those "reasonable expenses that the Secretary determines, by regulation, to be allowable."  25 U.S.C. § 450j(l)(2).  The regulations, in turn, explain that there are "three options available" for section 105(l) leases.  A "lease may be based" on the building's fair market rental, on the other elements in 25 C.F.R. § 900.70, or on some combination of the two.  25 C.F.R. § 900.74.  Maniilaq chose option two for its Kivalina clinic lease, submitting a list of the allowable cost elements with a corresponding funding request for each.  See Kivalina Declination at 35.  As the lease must be "based on" these elements, the argument goes, they also define the amount of compensation the lease must include.  The Secretary is permitted to push back on the requested amount if it is "duplicative," 25 C.F.R. § 900.70, or not "reasonable," 25 U.S.C. § 450j(l)(2).  But she may not stray from the specified "three options" in determining the applicable amount of lease compensation, nor cap the amount of that compensation at what she has historically paid to secure clinic space in Kivalina.  See Pl.'s Mem. at 19–21, 26–28.  In other words, Maniilaq contends that section 105(l) and its regulations together

determine the "applicable funding level to which [it] is entitled" for the Kivalina lease and that, in this case, that amount is $249,842 per year.

Although not the only plausible interpretation, Maniilaq's interpretation is a reasonable one. It rests on two premises, each of which finds some support in the statute and regulations. Premise one is that the regulations specify those elements that <u>must</u> be included in Maniilaq's Kivalina lease. For that proposition, Maniilaq relies on section 900.74, which can be read to create "three options" for section 105(l) "lease[s]," and to define each option by reference to the cost elements it includes. Premise two is that, once a lease is "based on" a set of elements, <u>see</u> 25 C.F.R. § 900.74, those elements dictate the necessary amount of lease compensation. This premise, too, can be reasonably grounded in text. More often than not, the statute and regulations link the concept of "compensation" to the listed elements. <u>See</u>, <u>e.g.</u>, 25 U.S.C. § 450j(l)(2) ("Such compensation may include . . . reasonable expenses the Secretary determines, by regulation, to be allowable."); 25 C.F.R. § 900.70 (title) ("What elements are included in the compensation for a lease . . . ?"); <u>see also</u> <u>id.</u> § 900.69 ("The lease is to include compensation as provided in the statute <u>as well as</u> such other reasonable expenses that the Secretary determines, by regulation, to be allowable." (emphasis added) (internal quotation marks omitted)). Plainly, then, the "compensation" requirement and the specified cost elements are engaged in a dialogue, with the necessary amount of compensation the topic of conversation. True, the term "amount" is absent from section 105(l) and its regulations. But each of the terms that <u>are</u> employed in the text— namely "compensation," "expenses," <u>see</u> 25 U.S.C. § 450j(l)(2), and "costs," <u>see</u> 25 C.F.R. § 900.73—can be readily quantified and monetized.

Section 900.73 also provides clues as to the relationship between the compensation requirement and the cost elements. That section asks whether "a lease with the Secretary [is] the

only method available to recover the types of cost described in § 900.70?"  The answer—that "the same types of costs may be recovered in whole or in part under section 106(a) of the Act," id.—is significant for a number of reasons.  First, it links the compensation requirement to the concept of "recover[y]."  To "recover" is "[t]o get back or regain in full or in equivalence."  Black's Law Dictionary 1389 (9th ed. 2009).  If tribal cost recovery is section 105(l)'s focus, the cost elements included in the lease should dictate the amount of necessary compensation.[5]  Second, section 900.73 appears to designate section 105(l) leases and section 106(a) funding as equivalent methods of tribal cost recovery.  Surely, when cost elements are "recovered" through section 106(a), they would affect the "[a]mount of funds provided."  25 U.S.C. § 450j-1(a) (title).  Maniilaq might fairly expect that, when those same elements are "recovered" through section 105(l), they would affect the amount of "compensation" in a similar way.

### C. The Secretary's Interpretation Is Not Compelled by the Statute and Regulations

The Secretary responds with arguments designed to sever any connection between the cost elements and the amount of lease compensation required by section 105(l).  Yes, the Secretary admits, Maniilaq is entitled to compensation for the Kivalina lease.  But because "all of the statutory language following this mandate becomes discretionary when it pertains to what that compensation" must be, any of the listed cost elements may be excluded from the lease as an exercise of the Secretary's discretion.  Gov't's Mem. at 34.  The Secretary is correct that section 105(l) itself deals only with what compensation may include.  See 25 U.S.C. § 450j(l)(2).  The regulations, however, are far less consistent on that subject—section 900.70 alone is of two minds regarding whether the cost elements "are included in the compensation for a lease" or "may be included in the lease compensation."  (emphasis added).  The Secretary offers no principled reason

---

[5] Indeed, Black's provides an illustration of recovery well-suited to this case: "[T]he landlord recovered higher operating costs by raising rent."  Id.

to disregard the mandatory language in favor of the more permissive language she prefers. Similarly, relying on the word "propose," the Secretary argues that section 900.74 governs only the necessary form of Maniilaq's proposal and, properly construed, says nothing about the contents of the resulting lease. See Gov't's Mem. at 33–35. But why, then, does the body of the regulation provide "three options" for "the lease," rather than for the proposal? Again, the Secretary provides no answer.

The reason, perhaps, is that the Secretary has more fundamental issues with Maniilaq's interpretation. According to the Secretary, section 106(a) is the "only provision of the [Act] addressing the amount of funds provided" to a Title V compactor like Maniilaq. Gov't's Mem. at 20 (capitalization altered). Because the "compensation" requirement is codified in section 105 rather than section 106, the argument goes, it simply cannot be interpreted as an entitlement to a specific level of funding. See id. at 26–27. The Secretary believes section 105(l) was aimed at narrower purposes. First, according to a legal interpretation by the Health Care Financing Administration in effect when section 105(l) was enacted, full federal reimbursement was reserved for services rendered at facilities owned or leased by the Secretary. By requiring leases between tribal organizations and the Secretary, section 105(l) was intended to facilitate full federal reimbursement of health services rendered at tribally owned facilities. See id. at 28–30. Second, section 105(l) was meant to establish a set of "allowable cost[]" principles tailored to tribal needs. See id. at 30–32.

These arguments have some force. It is surely relevant that section 106 purports to control "[c]ontract funding and indirect costs," while section 105 deals with "[c]ontract or grant provisions and administration." And there is some support in the record for the Secretary's legislative and regulatory history argument. The 1994 legislation that added section 105(l) to the Act was, in part,

a reaction to regulations proposed by the Secretary earlier that year. <u>See</u> S. Rep. 103-374 at 3. Those proposed regulations expressly freed the Secretary of any obligation to enter leases for tribally owned property. <u>See</u> Indian Self-Determination and Education Act Amendments, 59 Fed. Reg. 3,166, 3,198 (proposed Jan. 20, 1994). They also specified that "expenses associated with the use and depreciation" of tribally owned property used to provide services under the Act "shall be recovered in accordance with the cost principles covered in Subpart D" of the proposed regulations, which covered "Financial Management." <u>See id.</u> at 3,198; <u>see also id.</u> at 3,170 (suggesting use of the cost principles in OMB Circular A-87 to determine allowable costs for tribal governments). Both threads are indeed picked up in section 105(l) and its implementing regulations. Hence, the argument goes, by requiring the Secretary to enter into leases at a tribe's request, section 105(l) departed from the first aspect of the proposed regulations—thereby facilitating full federal reimbursement for services rendered through tribally owned clinics. Consistent with the delegation in section 105(l), moreover, the Secretary's current regulations also appear to address the subject of "allowable costs." <u>See</u> Indian Self-Determination and Education Assistance Act Amendments, 61 Fed. Reg. 32,482, 32,490 (June 24, 1996); <u>see also</u> 25 U.S.C. § 450j(l) ("[C]ompensation may include . . . such other reasonable <u>expenses</u> that the Secretary determines, by regulation, to be <u>allowable</u>." (emphasis added)).

But while the Secretary's account is plausible, it also has some gaps. First, the Court cannot be certain that section 106(a) creates the Act's sole funding entitlements. Indeed, Title V's provision governing the "[a]mount of funding" explains that compactors must receive "the amount that the Indian tribe would have been entitled to receive under self-determination contracts under this subchapter, <u>including</u> amounts . . . specified under [section 106(a)]." 25 U.S.C. § 458aaa-7(c) (emphasis added). Because the Act seems to contemplate that tribes may be entitled to funding

apart from that provided through section 106(a), the mere fact that the "compensation" requirement is codified in section 105 does not defeat Maniilaq's argument. Nor does the legislative history. Maniilaq can concede that section 105(l) was intended in part to unlock full federal reimbursement rates and in part to provide a list of "allowable costs" without also conceding that the amount of "compensation" due under section 105(l) leases falls solely within the discretion of the Secretary.

And that, finally, is the core of the Secretary's position. <u>See</u> Gov't Mem. at 18. Under section 900.74, Maniilaq may propose a lease based on the elements set out in the regulations. Empowered by the regulations' purely discretionary language, however, the Secretary may exclude any of those elements from the lease or its compensation. "The Secretary shall compensate," 25 U.S.C. § 450j(l)(2), but the <u>amount</u> of that compensation is ultimately untethered to the inclusion or exclusion of any particular element. Those elements, properly treated as a list of "allowable costs," do not speak to amounts of compensation at all.[6] The amount of Maniilaq's funding—including any lease compensation—is determined solely by section 106(a)(1) and, therefore, remains solely within the Secretary's discretion.

Here, the Secretary "would have otherwise provided" $30,921 a year to procure clinic space in Kivalina. 25 U.S.C. § 450j-1(a)(1). Thus, even under the Secretary's theory that section 106(a) alone determines the necessary amount of lease compensation, Maniilaq is entitled to $30,921 in compensation under its Kivalina clinic lease. But to test the boundaries of the

---

[6] Generally, the designation of "allowable costs" is one part of a process through which a government contractor is reimbursed for costs it incurs while performing on its contract. <u>See</u> Charles Tiefer & William A. Shook, Government Contract Law 179–80 (2d ed. 2004). The Secretary appears to believe that, by simply labelling the elements in section 900.70 as "allowable costs," she has made section 105(l) look less like a provision that would require a specific amount of money to change hands. But it is not clear why that would be so. "Allowable costs" are those that can be reimbursed or recovered—most likely, by payment of money. The Secretary leaves the Court guessing as to whether, and how, the "allowable costs" in section 900.70 might be recovered under the Act or Compact. Given that absence of guidance from the Secretary, section 900.73 appears to hold the answers: yes, Maniilaq may "recover" those allowable costs; and yes, it may do so through section 105(l) lease compensation.

Secretary's theory, assume that Maniilaq was seeking a lease for a new clinic, in a village where it had never operated one before. In that case, could the Secretary fix the section 106(a)(1) amount for the clinic at zero? Would she refuse to pay Maniilaq lease compensation in any amount greater than zero dollars? The Secretary appears to believe that she would be justified in doing so.[7] If Maniilaq was persuaded to enter such a lease, in what sense would it include "compensation"? 25 U.S.C. § 450j(l)(2). In what sense would it be "based on" one of the "three options" in section 900.74? How would it facilitate Maniilaq's attempt to "recover the types of cost described in [the regulations]"? 25 C.F.R. § 900.73 (title). These questions pose serious problems for the Secretary's interpretation, which the Secretary has not adequately addressed.

### D. Summary and Remedy

Section 105(l) requires the Secretary to enter a lease with Maniilaq for its Kivalina clinic. It also requires the Secretary to pay compensation. Section 105(l) itself is ambiguous regarding how much compensation the Secretary must pay. Maniilaq has put forward a reasonable argument that the (ambiguous, and sometimes self-contradictory) implementing regulations fully determine that amount. The Secretary resists this conclusion. In her view, section 105(l) and its regulations unambiguously commend the amount of lease compensation to her discretion, constrained only by the funding floor in section 106(a)(1). But in multiple instances, the Secretary's arguments collide with the loose language of the regulations. And the Secretary has not offered the Court easily accessible routes around the textual obstacles.

---

[7] Three years after the current regulations were enacted, a working group of federal and tribal participants adopted an "Internal Agency Procedures Handbook for Non-Construction Contracting under Title I of the Indian Self-Determination and Education Assistance Act." See Ex. 12 to Gov't's Mem. [ECF No. 15-14]. That handbook states that section 105(l) leases "must be funded from resources currently available under the [tribe or tribal organization's] self-determination contract." Id. at 7. It also authorizes leases "for a token sum to formalize the relationship between the facility and the contracted program(s)." Id. Maniilaq cannot be bound by this type of guidance, absent its express consent. 25 U.S.C. § 458aaa-16(e). Needless to say, neither is the Court.

Mindful of its obligation to construe the Act and its regulations "liberally in favor of" Maniilaq, Chickasaw Nation, 534 U.S. at 93 (internal quotation marks omitted); see also 25 U.S.C. § 458aaa-11(f); 25 C.F.R. § 900.3(b)(11), the Court will grant summary judgment in its favor. The regulations codified at 25 C.F.R. §§ 900.69–900.74 determine the amount of compensation that must be paid under a section 105(l) lease, and therefore also determine the "applicable funding level to which [Maniilaq] is entitled." 25 U.S.C. § 458aaa-6(c)(1)(A)(i). Maniilaq properly proposed entering a lease for the Kivalina clinic "based on paragraphs (a) through (h) of § 900.70." See 25 C.F.R. § 900.74. Using her statutory declination rights, the Secretary was permitted to decline compensation requests that were "duplicative," see id. § 900.70, or not "reasonable,"[8] see 25 U.S.C. § 450j(l)(2). But she was not entitled to use section 106(a) to cap the "applicable funding level to which [Maniilaq is] entitled" at $30,921, the amount that she had historically paid to secure clinic space in Kivalina. When the Secretary declined to enter the lease on that ground, she acted without the support of "controlling legal authority." 25 U.S.C. § 458aaa-6(c)(1)(A). Hence, she has failed to show "by clear and convincing evidence the validity of the grounds for rejecting [Maniilaq's] offer." Id. § 458aaa-6(d).

The Court recognizes that this decision may require a substantial increase in funding for the VBC program and thus place additional strain on already scarce resources. Although the Court

---

[8] The Secretary has devoted a few paragraphs to arguing that Maniilaq's section 106(a)(1) funding already addressed several of the regulatory cost elements included in Maniilaq's proposal, and thus that approving the proposal would have necessarily created duplication as prohibited by section 900.70. See Gov't's Mem. at 35–36.

But that reasoning cannot support the Secretary's declination here. For one, Maniilaq has offered to retrocede all of its funding for the Kivalina lease, thus mooting this alleged duplication problem. Moreover, it is a stretch to argue, as the Secretary does, that Maniilaq's section 106(a)(1) funding was based on any of the regulatory cost elements or expenses. In reality, it was based on the factors set out in the Secretary's 1991 circular. Simply saying that the resulting leases included compensation for "all maintenance and operational costs" does not make it so. See Ex. J to Pl.'s Mem. at 3–4. And finally, even assuming some continuing overlap between Maniilaq's section 106(a)(1) funding and its section 105(l) lease proposal, the proper course for the Secretary would have been to reduce Maniilaq's proposal by the amount of the overlap—not to simply claim duplication and then reject the proposal outright.

is sympathetic to the difficulty of the Secretary's position, the Court may not properly bend the text of the statute and regulations to maintain the funding status quo. This is not a normal agency review case, where judicial review "is highly deferential and presumes agency action to be valid." Defenders of Wildlife & Ctr. For Biological Diversity v. Jewell, No. 14-5284, 2016 WL 790900, at *6 (D.C. Cir. Mar. 1, 2016) (internal quotation marks omitted). Quite the opposite. Under the Act, the Secretary has the burden to prove, by clear and convincing evidence, the validity of its grounds for rejecting Maniilaq's proposal. See 25 U.S.C. § 458aaa-6(d). The Court's role is to hold the Secretary to that burden, while construing the Act and regulations liberally in Maniilaq's favor. If Congress or the Secretary objects to the result reached here, they may clarify the meaning of the statute and regulations on which it is based. But for the time being, based on the Act and regulations as they exist today, Maniilaq must prevail.

That leaves only the issue of remedy. Maniilaq asks the Court to reverse the Secretary's declination, compel her to incorporate Maniilaq's proposed Kivalina lease into the funding agreement, and require her to pay $249,842 in lease compensation. Compl. ¶ 64. The Court will vacate the Secretary's declination but stop short of requiring the other specific relief that Maniilaq requests. The Act authorizes the Court to "order appropriate relief including money damages, injunctive relief . . . , or mandamus" upon finding a violation of the Act or its regulations. 25 U.S.C. § 450m-1(a). Here, it is clear that negotiations between the parties broke down in the weeks prior to Maniilaq's lease proposal. See Pl.'s Opp'n & Reply [ECF No. 18] at 27–28; Gov't's Reply [ECF No. 19] at 4. Thus, the Court thinks it appropriate to compel the parties to discuss, in a manner consistent with this opinion, the proper amount of compensation for the Kivalina clinic lease for the period from February 1, 2015, to September 30, 2015, and how the amount of lease compensation shall be determined in subsequent years. See Pyramid Lake Paiute Tribe v. Burwell,

70 F. Supp. 3d 534, 545 (D.D.C. 2014) (holding that the Secretary misapplied a statutory declination ground but compelling further negotiations in lieu of adding the improperly declined proposal to the contract).

## CONCLUSION

For the reasons set out above, the Court will grant Maniilaq's motion for summary judgment and deny the Secretary's. The parties are compelled to meet and confer regarding the proper amount of compensation for the Kivalina clinic lease. A separate Order has issued on this date.

_____
/s/
JOHN D. BATES
United States District Judge

Dated: <u>March 22, 2016</u>